IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| v. | **NO. 1:09-CR-546-RWS-GGB** |
| **SYLVESTER SINGLETON,** | |
| **Defendant.** | |

**FINAL REPORT AND RECOMMENDATION**

Defendant Sylvester Singleton ("Defendant") is charged with two counts of possessing and uttering counterfeit gold certificates and one count of bank fraud, in violation of 18 U.S.C. §§ 472 and 1344. Pending before this court are Defendant's motions to suppress statements and evidence [Docs. 15 and 16]. An evidentiary hearing on these motions was held before me on February 4, 2010. All transcript references ("Tr. __") are to the transcript of that hearing. The parties have briefed the issues, and this matter is ripe for ruling.

**I.  FACTS**

Singleton began a term of supervised release on July 25, 2008. United States Probation Officer Ben Perkins ("Perkins") was assigned to supervise him. Standard Condition Three of Singleton's supervised release states: "The defendant shall report to the probation officer as directed by the court or probation officer and shall submit

AO 72A
(Rev.8/82)

a truthful and complete written report within the first five days of each month." (Gov't Ex. 1 at 5; Tr. 8). The required "Monthly Supervision Report" contains a section entitled, "Monthly Financial Statement." (Gov't Ex. 2). That section requires information pertaining to employment, earnings, cash flow, and bank accounts. (Id.; Tr. 9). Standard Condition Four of Singleton's supervised release states, "The defendant shall answer truthfully all inquiries by the probation officer, shall provide the probation officer access to requested financial information, and shall follow the instructions of the probation officer." (Gov't Ex. 1 at 5; Tr. 8-9, 25).

As a special condition of Singleton's supervised release, Singleton was "prohibited from engaging in any form of self-employment without the consent of the probation officer." (Gov't Ex. 1 at 6; Tr. 9). Singleton was also ordered to pay restitution. (Gov't Ex. 1 at 7; Tr. 11). During his initial meeting with Singleton, Perkins explained to Singleton that his supervised release could be revoked and he could be sent to jail if he did not comply with the conditions of his supervised release. (Tr. 24).

In February or March 2009, Perkins received information from attorney William Rucker ("Rucker") that Singleton had retained Rucker to incorporate a company called "GNISS" and to validate assets associated with GNISS, including gold certificates. (Tr. 10, 25-26). Rucker expressed concerns about the legality of Singleton's activities

2

related to GNISS. (Tr. 32). Perkins' conversation with Rucker also raised a question about whether Singelton had altered the body of a letter containing Rucker's signature. (Tr. 10, 26).

Perkins referred the GNISS matter to the Postal Inspection Service for investigation of possible criminal activity. (Tr. 26-27). However, the investigation was closed without prosecution. (Tr. 10-11, 27). Perkins also conducted his own limited investigation. He visited a website operated by the Georgia Secretary of State's Office. He learned that GNISS had been incorporated and that Singleton was associated with the company. (Tr. 27).

After learning that Singleton was associated with GNISS, Perkins instructed Singleton to come to his office. They met on June 3, 2009. Perkins told Singleton that he was aware that Singleton had become involved with GNISS and asked him specific questions about his activities relating to GNISS, including questions about the documents that he had provided to Rucker. Perkins told Singleton that he suspected that Singleton was violating the special condition prohibiting self-employment. (Tr. 28-29; Gov't Ex. 3).

Singleton acknowledged that he had violated the condition against self-employment. (Tr. 13, 29). Singleton also told Perkins the following: that he started GNISS after he was approached by some people who had formed a corporation

3

called Renaissance Global Investments ("RGI"); that they gave him various documents, including railroad certificates, gemstone certificates and gold certificates; he asked Rucker to verify the documents; Rucker advised him in January or February of 2009 that the documents supplied by RGI were not valid; and Singleton had no further involvement in the matter because he knew that the documents were fraudulent. (Tr. 11-13, 29-31; Gov't Ex. 3). Singleton added that he had not felt compelled to report his activities regarding GNISS because he never used the assets provided by RGI. (Tr. 13).

Perkins asked to see the documents that Singleton had obtained from the RGI representatives. Singleton told him that he had returned them to the people who had given them to him. (Tr. 32-33). Perkins asked him if he could re-obtain the documents. (Tr. 32). Singleton said that he could. Perkins directed Singleton to provide the documents by June 5, 2009 (two days later). Singleton did not return with the documents on June 5th. (Tr. 33).

After Singleton failed to return with the documents, Perkins called him several times and left voice mail messages. (Tr. 33-34). In his messages, Perkins told Singleton that he (Perkins) had to report on the situation to the court, and if Singleton was not going to provide the documents, Singleton needed to tell him that, and Perkins would relay that information to the court. (Tr. 34).

4

Eventually, Singleton contacted Perkins, and they set up a meeting for June 24, 2009. At that meeting, Singleton brought only some paperwork from the Secretary of State's website. Singleton continued to insist that his only involvement with the documents was to have them reviewed by an attorney, and that he ceased any further involvement with them once he learned that they were not valid. (Tr. 35).

Perkins continued to request the documents that Singleton had provided to Rucker for review. (Tr. 35-36). Perkins told Singleton that if he did not provide the documents, that he (Perkins) would tell the court that Singleton had refused to submit them. Singleton then said that he could get the documents by the following Monday. (Tr. 36). During the first week in July, Perkins found the documents that he had been requesting from Singleton in his in-box at the probation office. (Tr. 35, 37-38). Among them were purported gold certificates in the amount of $100,000. (Tr. 37-38; Gov't Exs. 3, 4).

Perkins provided the documents to the probation department's financial specialist to analyze. (Tr. 38). Perkins and the financial specialist determined that the documents related to some type of investment scheme, but they were not able to determine whether it was fraudulent. (Tr. 38). Perkins subsequently wrote a letter to District Judge Story, updating him about the information he had obtained pertaining to Singleton's conduct. (Tr. 39). He advised Judge Story that he intended to seek input

5

from the United States Attorney's Office before drafting a petition for revocation, because the investment scheme was complicated, and he did not have experience with it. (Tr. 38-39).

Because Perkins believed that Singleton had violated the conditions of supervision, he brought Singleton back into his office and offered Singleton an opportunity to sign a waiver to modify his conditions of supervision and spend a period of time, possibly six months, in a half-way house. (Tr. 39-40). Singleton told Perkins that he did not wish to accept the modification. (Tr. 40).

On November 3, 2009, United States Secret Service Agent William Gray ("Agent Gray") contacted Perkins and informed him that he was investigating Singleton for uttering counterfeit gold certificates on July 8, 2009. (Tr. 15-16). Agent Gray had received the purported gold certificates from an attorney representing a real estate brokerage firm that had received the certificates as earnest money in a real estate transaction. (Tr. 65-66). The real estate firm had contacted the Secret Service in order to verify the legitimacy of the certificates. The Secret Service determined that the certificates were counterfeit. (Tr. 66).

On December 15, 2009, a grand jury in this district returned an indictment that charged Singleton with possessing and uttering counterfeit gold certificates on July 8,

6

AO 72A
(Rev.8/82)

2009, with intent to defraud. (Tr. 67, 76). The indictment was sealed, and an arrest warrant was issued for Singleton's arrest on these charges. (Docs. 3, 4).

On December 17, 2009, Perkins went to Singleton's home for the purpose of conducting a home visit because Singleton had indicated on a monthly supervision report form that he had moved. (Tr. 41, 66-67, 76). Agent Gray accompanied Perkins, and Perkins introduced Gray to Singleton as a probation officer. (Tr. 43). Agent Gray went to Singleton's house for the purpose of verifying where Singleton lived in order to plan his arrest on the indictment. (Tr. 77). During this visit, Perkins obtained information basic to home visits and asked Singleton about matters pertaining to his case, such as whether he was now involved with anything that he should not be. Singleton stated that he was not. (Tr. 43).

Later that day, Perkins presented a petition to revoke Singleton's supervised release to the district court and obtained a warrant for Singleton's arrest in Case No. 1:06-cr-465. One of the allegations in the petition was that Singleton had used five counterfeit gold certificates as earnest money in a real estate transaction. (Case No. 1:06-cr-465, Doc. 19). On December 21, 2009, Perkins, his supervisor Jan Kay, Agent Gray, three other Secret Service agents, and a local Union City police officer went to Singleton's residence. (Tr. 18, 45). Agent Gray identified himself, placed Singleton under arrest, advised him of the charges against him, and asked him if he

7

would be willing to talk with the officers.  Agent Gray read Miranda warnings to Singleton from a Secret Service form entitled, "Warning and Consent to Speak." (Gov't Ex. 5). Agent Gray read the entire form to Singleton. Singleton agreed to speak and signed the form in three places. (Id.; Tr. 71).  The waiver portion of the form stated:

> I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or force of any kind has been used against me.  I hereby voluntarily and intentionally waive my right to remain silent and my right to have an attorney at this time. I am willing to make a statement and answer questions.

(Gov't Ex. 5).

Agent Gray also asked Singleton for permission to search the premises. Singleton consented to the search and signed a Secret Service consent-to-search form that allowed Secret Service agents and probation officers to search for evidence of counterfeit securities and violations of probation.  The form advised Singleton that he had the right to refuse to consent to the search.  He signed below the statement, "This written permission is being given by me to the above named persons voluntarily and without threats, duress, or promises of any kind."  (Gov't Ex. 6; Tr. 72-73).

Agent Gray questioned Singleton at his home.  Perkins was in the room during the interview.  (Tr. 51).  Towards the end of the interview, Perkins told Singleton that

8

they already knew a lot of the things Singleton was telling them and he believed that Singleton was not being candid with the agents. Perkins also told Singleton that he was facing a lengthy jail sentence and he could possibly help himself by being more candid or cooperative with the agents. Singleton did not change his version of events or provide additional information after Perkins' comments. (Tr. 52).

Agents searched Singleton's home pursuant to his consent. Singleton helped in the search by telling the agents that relevant documents would be found in a closet in a spare bedroom. Agents found and seized numerous items, including documents relevant to the prosecution. (Tr. 73-74).

## II. DISCUSSION

Singleton argues that he was compelled to provide incriminating information against himself in violation of his Fifth Amendment privilege against self-incrimination. As discussed below, I find that Singleton is correct with respect to his probation officer's demand that Singleton produce the incriminating documents that Singleton had provided to Rucker, but not correct as to other information that he provided to his probation officer and the Secret Service.

The Fifth Amendment to the United States Constitution, in relevant part, provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "[T]his prohibition not only permits a person to

9

refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" Minnesota v. Murphy, 465 U.S. 420, 426 (1984)(quoting Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S. Ct. 316, 322 (1973)). A person protected by the privilege may refuse to answer unless provided with immunity against the use of the compelled statements; absent such protection, his answers are inadmissible in a later criminal prosecution. Lefkowitz, 414 U.S. at 78, 94 S. Ct. at 322.

In Murphy, the Supreme Court addressed the issue of whether the Fifth Amendment protection against compelled self-incrimination required suppression (in a separate criminal prosecution) of admissions the defendant Murphy had made to his probation officer. Murphy was on probation for a sex-related offense. The terms of his probation required him to participate in a treatment program for sexual offenders, to report to his probation officer periodically, and to be truthful with the officer "in all matters." Murphy, 465 U.S. at 422. During the course of his court-ordered treatment, Murphy admitted a rape and murder to his counselor. The counselor contacted Murphy's probation officer, who questioned Murphy about the incident and obtained a confession. In his trial for the murder, Murphy sought to have his confession

10

AO 72A
(Rev.8/82)

suppressed on the ground that it was obtained in violation of the Fifth Amendment. Id. at 425.

The Supreme Court observed that the privilege against self-incrimination is not self-executing and generally must be claimed. In other words, if a person wants the protection of the privilege, he must assert it. Id. at 427 (citing United States v. Monia, 317 U.S. 424, 427, 63 S. Ct. 409, 410 (1943)). Thus, in the ordinary case, if a witness under compulsion to testify voluntarily makes disclosures instead of claiming the privilege, the government has not "compelled" him to incriminate himself under the Fifth Amendment. Id. (citing Garner v. United States, 424 U.S. 648, 654, 96 S. Ct. 1178, 1182 (1976)).

However, one exception to that general rule is "where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and ... compe[l] ... incriminating testimony.'" Id. at 434 (quoting Garner, 424 U.S. at 661, 96 S. Ct. at 1186). The Court referred to this as the "classic penalty situation." Id. at 435, 96 S. Ct. at 1146. The Court explained:

> A state may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the state, either expressly or by implication, asserts that

11

>invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

Id.; accord United States v. Zinn, 321 F.3d 1084, 1091 (11th Cir. 2003).

In a footnote, the Court added, "Our cases indicate, moreover, that a state may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." Murphy, 465 U.S. at 435 n.7. The Court concluded that Murphy's case did not present a penalty situation.

Certain circumstances are present here that distinguish Singleton's case from that of defendant Murphy and bring Singleton's act of production of documents[1] within the "classic penalty situation" described by the Supreme Court. Most importantly, here, unlike the situation in Murphy, there was a genuine threat of revocation from the probation officer with respect to the production of documents. When Perkins repeatedly told Singleton that he needed the documents in order to report to the court, and that he would tell the court if Singleton did not provide them, he strongly implied

---

[1] The Fifth Amendment privilege applies to the act of producing documents, but not to the content of the documents. See United States v. Doe, 465 U.S. 605 (1984)(finding that act of producing business records in response to grand jury; see also United States v. Hubbell, 530 U.S. 27 (2000).

12

to Singleton that his probation would be revoked if he did not provide the requested documents.[2] Cf. United States v. Cranley, 350 F.3d 617 (7th Cir. 2003). In Cranley, the court concluded that a probationer's mere fear of revocation was not sufficient to create a penalty situation, but stated that the result would have been different if the police had told the probationer that his probation would be revoked unless he talked to his probation officer. Id. at 622.

Further, in Murphy, the Court emphasized that there was no reason to believe that defendant Murphy could be penalized in Minnesota for invoking his Fifth Amendment right to be silent. Murphy, 465 U.S. at 437. By contrast, in this circuit, Singleton could have been penalized for asserting that right. The Eleventh Circuit has ruled that a defendant's probation may be revoked when he invokes the Fifth Amendment rather than answer questions by his probation officer about possible violations of his conditions of probation. See United States v. Robinson, 893 F.2d 1244, 1245 (11th Cir. 1990); see also United States v. Saechao, 418 F.3d 1073, 1080-81 (9th Cir. 2005)(finding penalty situation existed where probationer who provided incriminating information to probation officer about unlawful possession of a firearm

---

[2] In so doing, I do not suggest that Perkins did anything improper. As the Court in Murphy noted, a probation officer may validly insist on answers to even incriminating questions. Murphy, 465 U.S. at 435 n.7. The potential problem occurs when the government attempts to use those answers in a subsequent criminal prosecution.

13

could have been punished for invocation of his Fifth Amendment privilege, citing Robinson as example); United States v. Ollie, 442 F.3d 1135, 1139 (8th Cir. 2006)(finding parolee's fear that he could be punished unless he spoke was reasonable because there were no clear precedents that a parolee could not be punished for ending the interview without the permission of the police or his parole officer); cf. United States v. Oakes, No. Crim. 00-76-P-C, 2001 WL 30530, at *4 (D. Me. Jan. 10, 2001) (finding no penalty situation in part because under the Maine revocation statute, the state could not lawfully revoke an individual's probation solely for the legitimate exercise of his Fifth Amendment privilege).

Finally, the Court in Murphy emphasized that defendant Murphy's probation proscribed only false statements; the condition did not address his freedom to decline to answer particular questions. Murphy, 465 U.S. at 437. In contrast, Singleton's probation specifically required him to answer truthfully all inquiries by his probation officer and to provide his probation officer access to requested financial information.

Applying the principles discussed in Murphy to the facts of this case, I conclude that Singleton was facing the classic penalty situation in response to Perkins' persistent requests that he produce the incriminating documents that he had obtained from RGI and provided to Rucker for review.

14

However, the penalty situation did not exist with respect to Singleton's statements at the meetings between Perkins and Singleton on June 3rd and June 24th, 2009. On June 3rd, Perkins had not yet made his comments about going to the court. Any fear that Singleton may have had at that time about getting his probation revoked would not be a sufficient ground for ruling his statements inadmissible. See Cranley, 350 F.3d at 622. Moreover, on June 3rd, and again on the 24th, Singleton was far from confessing. Rather, he was trying to convince Perkins that there was an innocent explanation for the suspicious conduct that Perkins had already uncovered. Singleton had not yet engaged in the new criminal conduct for which he is now charged, which allegedly occurred on July 8, 2009. Thus, it appears that Singleton was motivated more by a desire to convince his probation officer that he had not done anything wrong than by any fear that his failure to speak would be used against him in a subsequent revocation proceeding. See Murphy, 465 U.S. at 438 (considering whether defendant had subjective fear of penalty).

In any event, Singleton gave the Secret Service a detailed explanation of his involvement with the gold certificates after he was arrested and given Miranda warnings on December 21, 2009. (Gov't Ex. 8). Singleton signed a comprehensive waiver form that clearly advised him that he had the right to remain silent. (Gov't Ex. 5). Singleton made his statements on that day after he knowingly and voluntarily

15

waived his right to remain silent. Nothing in <u>Murphy</u> (or subsequent cases interpreting <u>Murphy</u>) precludes a defendant on probation from waiving his constitutional right to remain silent after he is advised of that right and given an opportunity to assert it. Thus, Singleton's statements on December 21, 2009 should not be suppressed.

Singleton does not make any argument that his Fourth Amendment rights were violated by the search of his home. But in any event, his written consent to search was knowing and voluntary after he was advised of his right to refuse consent. Therefore, any evidence seized on December 21, 2009 should not be suppressed

### III.  CONCLUSION

For the above reasons, I recommend that Singleton's Motion to Suppress Statements and Other Evidence [Doc.15] be **GRANTED IN PART and DENIED IN PART**. I recommend that the motion be granted only with respect to Singleton's *act of production of documents* to the probation office (copied in Gov't Ex. 4); the motion should be denied in all other respects. I further recommend that Singleton's Motion to Suppress Evidence [Doc 16], which seeks to suppress evidence obtained on the day of Singleton's arrest, be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial. It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this 10th day of May, 2010.

_Gerrilyn G. Brill_
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)